IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KIMBERLY A. H.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 20-cv-00026-RJD[2] |
| | ) |
| COMMISSIONER of SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM AND ORDER

**DALY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Income Security (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for disability benefits in May 2016, alleging disability as of May 17, 2016. After holding an evidentiary hearing, an ALJ denied the application on January 16, 2019. (Tr. 15-24). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted, and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

---

[1] In keeping with the court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 8 & 12.

1. The ALJ erred by failing to evaluate the opinion of Plaintiff's treating physician consistent with the regulations and Seventh Circuit precedent.

### **Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The plaintiff bears the burden of proof at steps one through four. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show that there are jobs existing in significant numbers in the national economy which Plaintiff can perform. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of review is limited. "The findings of the

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **The Decision of the ALJ**

The ALJ followed the five-step analytical framework described above. He determined that Plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. Plaintiff is insured for DIB through December 31, 2020.

The ALJ found that Plaintiff has severe impairments of "type I diabetes mellitus and gastroparesis, esophageal stricture, and mild chronic gastritis; and left knee osteoarthritis." (Tr. 18).

The ALJ found that Plaintiff "has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b)." (Tr. 20).

Based on the testimony of a vocational expert, the ALJ concluded that Plaintiff is able to perform past relevant work as a cashier, parts clerk, and data entry clerk because "[t]his work does not require the performance of work-related activities precluded by the claimant's residual functional capacity…"  (Tr. 23).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.  The following summary of the record is directed to Plaintiff's arguments.

### 1. Agency Forms

Plaintiff was born in 1963 and was 55 years old on the date of the ALJ's decision.  (Tr. 242).  Plaintiff said she stopped working in July 2016 because of her conditions.  She worked as a manager at a tobacco shop from 2010 to 2012; a retail counter attendant from 2012 to 2014; and a data entry specialist from 2015 to 2016.  (Tr. 246-47).

In a Function Report submitted in March 2017, Plaintiff said she has neuropathy in her stomach, numbness in her lower extremities, pain, gastroparesis, an inability to lift items, weakness in her hands, and an inability to regulate her blood sugar.  Plaintiff said she does the dishes, helps with grandkids, and rests in between doing things.  She said she prepares meals like sandwiches, salads, and meat and potatoes two to three days a week, and she does some baking.  However, Plaintiff said she now is unable to stand while cooking or peel foods easily because of her hands.  Plaintiff said she does laundry, some dusting, some vacuuming, and normal housework, but she cannot stand for long periods.  (Tr. 284-86).  Plaintiff said she visits with friends on the phone and in person about once a month, and she does not go anywhere on a regular basis.  Plaintiff said

her conditions impair her lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair-climbing, seeing, and hand usage. Plaintiff said she can only walk half a block before needing to rest for ten minutes. (Tr. 288-89).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing in September 2018. (Tr. 31). Plaintiff testified the gastroparesis is her most limiting condition. Plaintiff said she has issues regarding bowel movements. She testified that she often throws up and feels like her stomach is going to explode. She said she sometimes does not eat for two days simply because she is unable to. Plaintiff said she had Botox procedures to open her passages which helped the first time but not the second time. Plaintiff said her toes are numb, her ankle nerves are broken, her feet turn purple, and her legs have tingling and burning sensations. The medication helps this but does not take it away completely. Plaintiff testified that she cannot sit for long periods of time before having to get up due to her neuropathy symptoms. Her legs will buckle and she could fall to the floor after sitting for long periods of time. Plaintiff said she can only stand about thirty minutes, and she has a hard time walking. She said she can only lift five to ten pounds now because of her hands. (Tr. 45-50). Plaintiff said she used to cook all the time, but she does not cook much anymore because she has a hard time mixing, standing, and peeling. Plaintiff said she helps take care of her grandchildren by helping with homework, and her leg issues keep her from going many places. (Tr. 54-55). Plaintiff said she rarely drives anymore and does not get out much. (Tr. 55, 57). Plaintiff said she has balance issues. (Tr. 58).

A vocational expert (VE) testified at the hearing. After the VE described Plaintiff's past work, the ALJ dismissed the VE saying, "…I believe between a combination of the GRID rules

and sub-regulatory policy in the form of SSR as I have sufficient information to make a decision, in either direction without hypothetical questions." (Tr. 66).

### 3. Relevant Medical Records

Plaintiff presented to Andrew Hosman, a physician assistant at Ferrell Hospital Family Practice, on June 16, 2015. A physical examination revealed Plaintiff's abdomen was soft, nontender, and nondistended; positive bowel sounds; and no edema. (Tr. 340-41).

Plaintiff presented to Elliott Partridge, a family medicine physician, around eighteen times between June 2015 and August 2018 reporting low pelvis pain; prominent fecal stasis; bowel trouble due to gastroparesis; abdominal pain; intractable vomiting; nausea; constipation; weight gain; numbness, tingling, and pain in her legs and feet; fatigue; over-sleeping; weakness; diarrhea; severe muscle spasms; hot coal sensations on the bottom of her feet; A1C levels over 10; rising blood sugars in the afternoon; swollen legs; falling; trouble eating; an inability to walk normally; a left knee injury due to a fall; neuropathy; an inability to go long without drinking something; and night sweats. (Tr. 345, 349, 352, 356, 361, 366, 599, 603, 609, 614, 626, 632, 638, 645, 752, 773, 777, 781).

Dr. Partridge noted Plaintiff had no pedal edema; had no CVA punch tenderness[4]; had a rotund but benign abdomen; had a soft, nondistended, nontender abdomen; had a tender but benign abdomen at one point; had mild epigastric tenderness; had positive bowel sounds; had ice cold feet; had a zero score on a proprioception and monofilament test; had leg and feet pain; had some

---

[4] CVA punch tenderness refers to, "a medical test in which pain is elicited by percussion of the area of the back overlying the kidney (the costovertebral angle, an angle made by the vertebral column and the costal margin). The test is positive in people with an infection around the kidney (perinephric abscess), pyelonephritis, hemorrhagic fever with renal syndrome or renal stone. Because the kidney is directly anterior to this area, known as the costovertebral angle, tapping disturbs the inflamed tissue, causing pain." https://encyclopedia.thefreedictionary.com/costovertebral+angle+tenderness, visited on October 20, 2020.

left ankle edema; had some crepitus and some tenderness in her left knee; had no acute bony abnormality in the left knee joint; had mild OA[5] and grade 2 sprain of the medial collateral ligament and of the proximal fibular collateral ligament; and had tenderness in the medial aspect of the left knee with pain with full extension.  (Tr. 345, 352, 357, 362, 366, 600, 604, 610, 614, 627, 633, 639, 646, 752-53, 774, 778, 782).  The assessment included poorly-controlled type 2 diabetes mellitus without complication with long-term insulin use, gastroparesis, obstipation, neuropathy, muscle cramps, generalized abdominal pain, fall, gastroesophageal reflux disease, esophagitis, osteoarthritis of the left knee, peripheral vascular disease, sprain of the left knee, and strain of the left knee, and plans included medications, follow-ups, A1C testing, a balance evaluation, physical therapy, blood testing, and gastrointestinal and endocrinology appointments.  (Tr. 345, 352-53, 357, 362, 366, 600, 604, 610, 614, 627-28, 633-34, 639-40, 646-47, 753, 774, 778, 782).

Plaintiff presented to Memorial Hospital of Carbondale on July 9, 2015, reporting uncontrolled blood sugars.  A physical examination revealed Plaintiff had a soft, nontender stomach; hyperactive bowel sounds; and 1 to 2+ pedal edema bilaterally.  The assessment included type 2 diabetes and diabetic gastroparesis, and plans included monitoring bowel movements and blood sugars.  (Tr. 523-24).

Plaintiff presented to Bruce Schneider, a gastroenterologist at Deaconess Clinic, on September 25, 2015, reporting gastroparesis.  Dr. Schneider noted Plaintiff had a soft, nondistended and nontender abdomen; present bowel sounds; and no edema.  The assessment included nausea, vomiting, and history of gastroparesis, and plans included an endoscopic exam

---

[5] OA refers to Osteoarthritis.  https://medical-dictionary.thefreedictionary.com/osteoarthritis, visited on October 20, 2020.

with Botox injection, abdomen and pelvis imaging, iron studies, and nausea treatment. (Tr. 377-79).

Plaintiff received a Botox injection for her gastroparesis on September 26, 2015, at Deaconess Clinic. (Tr. 380).

Plaintiff underwent a colonoscopy on September 27, 2015, and the impression was, "Diminutive Rectal Polyps x2." (Tr. 381). Recommendations included, "Monitor. Treat iron deficiency. Await path reports. Consideration for small bowel capsule." (Tr. 381).

Plaintiff presented to Dr. Schneider on March 27, 2016, for an esophagogastroduodenoscopy[6] (EGD) with small bowel capsule deployment. (Tr. 381-82). The impression was, "EGD with small bowel capsule placement into small bowel." (Tr. 383). Recommendations were, "Follow clinically. Await small bowel capsule. Patient will return this tomorrow morning. Further recommendations to follow. Continue to monitor lab work." (Tr. 383).

Plaintiff presented to Dr. Partridge on May 17, 2016, for a bilateral arterial ultrasound of her lower extremities, and they were "completely normal." (Tr. 366).

Plaintiff underwent a capsule endoscopy on May 26, 2016, and the findings included, "…few small AVMs[7] seen in the small bowel." (Tr. 746). Recommendations included iron supplementation and a follow-up. (Tr. 746).

Plaintiff presented to Dr. Schneider on June 13, 2016, for a follow-up. Dr. Schneider

---

[6] Esophagogastroduodenoscopy (EGD) refers to an exam used "to evaluate or treat symptoms relating to the upper gastrointestinal tract…" https://medical-dictionary.thefreedictionary.com/esophagogastroduodenoscopy, visited on October 20, 2020.

[7] AVM refers to, "Arteriovenous malformation." https://medical-dictionary.thefreedictionary.com/AVM, visited on October 20, 2020.

noted Plaintiff had a soft and nondistended abdomen; had no hepatosplenomegaly[8]; and had no peripheral edema. Plans included following CBC and iron levels, possible CT imaging of the abdomen and pelvis, and continued monitoring. (Tr. 383).

Plaintiff presented to Memorial Hospital of Carbondale on September 11, 2016, reporting stomach pain and nausea with no vomiting or loose stool. (Tr. 496). A physical examination revealed Plaintiff was pale; was afebrile; and had a soft and tender abdomen. (Tr. 498). The diagnosis included acute abdominal pain and bowel obstruction. (Tr. 511). Plaintiff underwent a CT scan of her abdomen and pelvis. (Tr. 517). The impression was, "1. There is no bowel obstruction or acute inflammatory changes seen within the abdomen and pelvis. 2. There is no ureteral obstruction." (Tr. 517).

Plaintiff presented to Angie Hampton, a licensed clinical professional counselor, on November 18, 2016, reporting suffering from gastroparesis, difficulty digesting food, diabetes, and neuropathy. (Tr. 595).

Plaintiff presented to Issa Abedmahmoud, an internist, once in April 2017 and once in May 2017 reporting blood sugar issues; severe gastroparesis; an inability to eat; nausea/vomiting; GERD; fatigue; polydipsia; blurry vision; bloating; abdominal pain; constipation; arthralgias; myalgias; leg cramps; peripheral neuropathy; lower extremity edema; brittle diabetes; weakness; excessive thirst; excessive sweating; diarrhea; gas; leg pain, numbness, burning and tingling; foot pain; and lower extremity edema. (Tr. 709, 712, 714, 716). Dr. Abedmahmoud noted Plaintiff had an A1C of 9.2; had a soft, nontender abdomen; had normal blood sugars; had no abdominal masses; had normal bowel sounds; and had no edema. (Tr. 709, 711, 716). The assessment

---

[8]   Hepatosplenomegaly refers to, "Enlargement of the liver and spleen." https://medical-dictionary.thefreedictionary.com/hepatosplenomegaly, visited on October 20, 2020.

included uncontrolled type 1 diabetes mellitus, gastroparesis, and peripheral neuropathy, and plans included managing diabetes with insulin, not skipping meals, checking blood sugars four times daily, taking medications, dietary efforts, and lab work.  (Tr. 709-10, 716).

Plaintiff presented to Joseph Jackson, a family medicine doctor, on April 25, 2017.  A physical examination revealed Plaintiff had a soft, nontender abdomen; had no abdominal guarding; had no abdominal masses; had normal bowel sounds; and had no edema.  The assessment included poorly controlled diabetes mellitus, and plans included handling her blood sugars and attending endocrinology appointments.  (Tr. 785-87).

Plaintiff presented to Victor Mwansa, a cardiologist, four times between May 2017 and January 2018 reporting diabetes mellitus; claudication[9]; severe reflux; epigastric pain; and leg cramping, swelling, and pain.  (Tr. 676-78, 680-81, 683-85).  A physical examination revealed Plaintiff had a nontender, nondistended abdomen; had no abdominal brit or masses; had a nontender liver and spleen; and had no edema.  The assessment included claudication, swelling of the lower leg, and epigastric pain, and plans included an ankle brachial index, using compression stockings, and a surgical referral.  (Tr. 678, 681, 683, 686).

Plaintiff presented to Megan Moore, an optometrist at Marion Eye Center, LTD, on May 10, 2017, reporting diabetes with worsening vision.  (Tr. 701).  The assessment included type 1 diabetes with ocular complications and blurred vision, and plans included systemic diabetes control, monitoring her conditions, and regular dilated eye exams.  (Tr. 703).

Plaintiff presented to Ukeme Umana, an ophthalmologist at Marion Eye Center, LTD, on May 11, 2017, reporting vision issues.  (Tr. 704).  The assessment included type 2 diabetes with

---

[9] Claudication refers to, "Limping."  https://medical-dictionary.thefreedictionary.com/claudication, visited on October 20, 2020.

ocular complications, and plans included systemic diabetes control with regular dilated eye exams and monitoring her conditions. (Tr. 706).

Plaintiff underwent an ankle brachial index[10] on June 9, 2017, and the impression was, "Resting ABI bilaterally." (Tr. 692).

Plaintiff underwent a bilateral lower extremity duplex venous ultrasound of the deep veins and bilateral evaluation for superficial venous reflux on June 20, 2017. (Tr. 688). The impression was, "No evidence of deep vein thrombosis. No evidence of deep venous reflux. Right side: Mild venous reflux of the right greater saphenous vein as above. Left side: Severe venous reflux of the left greater saphenous vein as above." (Tr. 689).

Plaintiff had her A1C checked on January 20, 2018, and the value was 8.7. (Tr. 719).

Plaintiff presented to Clay DeMattei, a general surgery specialist, on February 12, 2018, reporting epigastric bowel pain; dyspepsia[11]; dysphagia[12]; and diabetes. Dr. DeMattei noted Plaintiff had no visible epigastric pulsation of the abdomen; had normal bowel sounds; had no abdominal guarding; had no abdominal muscle rigidity; had no ascites[13]; had no direct tenderness to the abdomen; had no abdominal rebound tenderness; had no palpated mass in the abdomen; had a normal liver and spleen; and had no tissue injury to her abdomen. The assessment included esophageal stricture, and plans included an endoscopy of the upper gastrointestinal tract and a

---

[10] An ankle brachial index refers to, "The ankle-to-arm ratio of systolic blood pressure, which is useful in diagnosing peripheral arterial disease." https://medical-dictionary.thefreedictionary.com/ankle+brachial+index, visited on October 20, 2020.
[11] Dyspepsia refers to, "painful, difficult, or disturbed digestion, which may be accompanied by symptoms such as nausea and vomiting, heartburn, bloating, and stomach discomfort." https://medical-dictionary.thefreedictionary.com/dyspepsia, visited on October 20, 2020.
[12] Dysphagia refers to, "difficulty in swallowing." https://medical-dictionary.thefreedictionary.com/dysphagia, visited on October 20, 2020.
[13] Ascites refers to, "an abnormal accumulation of fluid in the abdomen." https://medical-dictionary.thefreedictionary.com/ascites, visited on October 20, 2020.

possible esophageal dilatation.   (Tr. 668-70).

Plaintiff underwent an MRI of her left knee on February 23, 2018.   The impression was, "No acute bony abnormality in the knee joint. Mild osteoarthritis of the medial tibiofemoral compartment and patellofemoral joint. Grade 2 sprain of the medial collateral ligament. Grade 2 sprain of the proximal fibular collateral ligament."   (Tr. 662).

Plaintiff underwent an esophagogastroduodenoscopy with balloon dilation to 20 millimeters and esophagogastroduodenoscopy with biopsy for H. pylori [14] and permanent pathology on March 16, 2018, to address dyspepsia, bloating, and gastroparesis.   The postoperative diagnoses were gastroparesis and pyloric stenosis.   Pathology was negative for H. Pylori, intestinal metaplasia, and dysplasia.   (Tr. 672-73).

Plaintiff presented to Keri Claybourn, a physical therapist, on April 12, 2018, reporting having a fall; having to use steps sideways; a weak left leg; knee aches; anterior left knee pain that improves with staying off of it; throbbing, catching, intermittent pain; and pain that is aggravated with steps and walking.   PT Claybourn noted Plaintiff ambulated with a slight limp on the left with decreased stance at times.   The assessment included left knee pain, and plans included further physical therapy.   (Tr. 735-37).

Dr. Partridge filled out a treating source statement on September 24, 2018.   Dr. Partridge said he treated Plaintiff every six weeks to three months for over thirty years.   Dr. Partridge said Plaintiff is likely to be off task more than twenty-five percent of a typical workday.   He said Plaintiff is likely to maintain attention and concentration for less than fifteen minutes before requiring a break due to her symptoms.   Dr. Partridge estimated Plaintiff would be absent from

---

[14] H. pylori refers to, "a gram-negative spiral bacterium that causes gastritis and pyloric ulcers in humans." https://medical-dictionary.thefreedictionary.com/H.+pylori, visited on October 20, 2020.

work four or more days a month on average. Dr. Partridge believed Plaintiff could frequently lift or carry less than ten pounds; occasionally lift ten pounds; rarely carry ten pounds; rarely lift twenty pounds; never carry twenty or more pounds; and never lift fifty or more pounds. Dr. Partridge noted Plaintiff could sit for seven hours in a workday and could stand or walk only one hour in a workday due to uncontrolled blood sugars and numbness in Plaintiff's feet. Dr. Partridge said Plaintiff would require the option to lie down or recline throughout the workday every twenty to thirty minutes for one to two hours each time. Plaintiff would require elevating her legs when sitting and would require the use of a cane or other assistive device to ambulate. Dr. Partridge noted Plaintiff would frequently have issues with handling, fingering, and feeling due to pain and numbness, and Plaintiff would rarely be able to use foot controls due to numbness and neuropathy. (Tr. 798-800).

## Analysis

Plaintiff asserts the ALJ erred by failing to evaluate the opinion of Plaintiff's treating physician consistent with the regulations and Seventh Circuit precedent. The ALJ was not required to fully credit Dr. Partridge's opinion because of that status; "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (internal citation omitted). A treating source's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Plaintiff filed her application before March 27, 2017. The applicable regulation, 20 C.F.R. § 404.1527(c)(2), provides, in part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

If the ALJ decides not to give the opinion controlling weight, he is to weigh it applying the factors set forth in § 404.1527(c)(1)-(6). Supportability and consistency are two important factors to consider in weighing medical opinions. In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques [,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010).

Here, the ALJ explained that he gave Dr. Partridge's opinion "less weight than the State agency medical consultant's assessment" because the severity of Dr. Partridge's limitations is inconsistent with the evidence. (Tr. 22). More specifically, the ALJ said, "The claimant reported good response to her ADHD medication…Further, treatment notes do not establish that the claimant was seeking acute care at least four days a month, contradicting Dr. Partridge's conclusion." (Tr. 22-23). The ALJ further noted that Dr. Partridge's opinion received less weight than the State agency medical consultants because his opinion "is not well supported and is inconsistent with the record as a whole." (Tr. 23). Defendant argues that, "The ALJ identified enough evidence conflicting with Dr. Partridge's opinions to instead reasonably rely on the opinions of the state-agency medical experts." (Doc. 28, p. 7). However, what Defendant fails

to acknowledge here is the extent of Dr. Partridge's physician-patient relationship with Plaintiff and how it involved much more than simply a treating source statement.  Acknowledgement of that is necessary to provide a logical bridge within the ALJ's decision.

This Court agrees with Plaintiff's argument.   Although Plaintiff makes many very specific assertions, it is important to note that they all revolve around the same overarching assertion: The ALJ neither provided legally sufficient reasons for giving Dr. Partridge's opinion less weight than the State agency medical consultants' opinions nor did he apply the checklist of factors provided by 20 C.R.F. § 404.1527.

The ALJ need not explicitly discuss each factor of the checklist, and some are implied simply within the discussion of medical records.  See *Henke v. Astrue*, 498 Fed.Appx. 636 (7th Cir. 2012).  However, an ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions."  *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), internal citations omitted.  The ALJ did discuss some treatment provided by Dr. Partridge for Plaintiff's left knee injury at Tr. 22.  The ALJ also acknowledged a few of Dr. Partridge's conclusions from his treating source statement and Dr. Partridge's thirty years of familiarity with Plaintiff and her impairments.  (Tr. 22).  However, the ALJ's error is in his lack of providing a logical bridge between the evidence and his conclusions.  The Court must conclude the ALJ failed to build the requisite logical bridge here.

It is clear from the medical records that Plaintiff saw Dr. Partridge for more medical issues than just her left knee injury.  Plaintiff saw Dr. Partridge for impairments regarding her diabetes, gastroparesis, and esophageal issues, to name a few.  The ALJ's failure to discuss more

thoroughly Plaintiff's medical records regarding Dr. Partridge created a gap in the record, and this directly affected the validity of the ALJ's assessment of Dr. Partridge's medical opinion versus the State agency medical consultants' opinions.

In light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The ALJ was not required to specifically indicate each factor as he considered them. However, as mentioned above, the ALJ is required to provide a logical bridge, and this precedes the minimal articulation standard here. The ALJ's discussion leaves a gap in the record regarding Plaintiff's treatment with Dr. Partridge and, therefore, fails to build a logical bridge regarding the ALJ's decision on the weight to give Dr. Partridge's medical opinion. This requires remand.

Plaintiff further argues that the ALJ relied on his own lay opinion of the medical evidence, suggesting the ALJ essentially played doctor. The ALJ "must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions. . ." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). The determination of RFC is an administrative finding that is reserved to the Commissioner. 20 C.F.R. §404.1527(d)(2). That said, the fact that the ALJ made a decision while considering the medical evidence does not alone indicate the ALJ played doctor. This argument by Plaintiff ignores the basic duties of an ALJ and, therefore, does not stand.

This Memorandum and Order should not be construed as an indication that the Court believes Plaintiff was disabled during the relevant period or that she should be awarded benefits.

On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED: October 22, 2020**

*s/ Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**